BELFAST AND MOOSEHEAD LAKE RAILROAD COMPANY, in equity,

*vs.*

CITY OF BELFAST and others.

Waldo.   Opinion August 6, 1885.

*Railroads.   Stock subscriptions.   Preferred stockholders.   "Net earnings."*
*Dividends.   Equity.*

A railroad corporation, at its organization, adopted a by-law, that its net earnings should be divided semi-annually amongst its stockholders, first paying upon the preferred stock an amount per annum not exceeding six per cent. and then, if a surplus, as much upon the non-preferred stock, and dividing any remaining surplus amongst all stockholders alike.   After this, preferred stock was subscribed for in general terms.   *Held:*  That the subscribers for preferred stock took their shares upon the conditions named in the by-law as a contract between themselves and the corporation.

There was a stipulation in the contract of subscription that there should be no assessment on shares until the full amount be subscribed sufficient to build the road, thereby avoiding the necessity of ever placing a mortgage upon it. But, without dissent by any party, debts were incurred and the road mortgaged, to obtain funds for its completion.   *Held:*  That this change in the policy of the company did not require that all such indebtedness should be paid before preferred dividends be declared.

The preferred stockholder is not a creditor; nor is a dividend guaranteed to him; he is entitled thereto by the by-law, provided there are net earnings; a deficiency of dividend for one year, for want of net earnings of that year, is not to be made up from the net earnings of another year; the by-law implies that all net earnings are to be wholly distributed each year.

The term "net earnings," in the by-law, means such as are applicable to dividends.   These would be the gross receipts less the expenses of operating the road, and less also interest on such of the company's indebtedness as it is prudent and proper to keep in a permanent form, and less also any floating or temporary liabilities which good judgment would require to be presently paid, and less also an annual contribution to a sinking fund for the payment of debts, whenever expedient and proper to provide such a fund.

As a rule, officers of the corporation are the sole judges of the propriety of declaring dividends.   But they are not allowed to act illegally, wantonly or oppressively.   And when the right to a dividend is clear, and there are funds from which it can properly be made, a court of equity will compel the company to declare it.

The company was incorporated in 1867; completed the construction of its road in 1870, the same costing one million dollars; the stock subscriptions were about $650,000; it leased its road, in 1870, for fifty years, for $36,000 per annum, lessees assuming all expenses, taxes and risks during the term; at date of this bill, November, 1882, the company from its receipts of rent had

paid off $150,000 of floating indebtedness; owed $150,000 of bonded mortgage debt, contracted in 1870, maturing in 1890; owed the city of Belfast, its principal stockholder, $88,000 (about) for money borrowed in 1870, payable in November, 1885; and, after the payment of all interest due on its obligations, had about $37,000 money in hand. The road has not a prospect of earning more than its operating expenses after its lease expires in 1920. *Held*: That the directors would be justified in refusing to declare a dividend until there are means enough on hand with which to pay the debt to Belfast. And it is the opinion of the court that, after that, some reasonable provision should be made for the final extinguishment of the mortgage debt by reserving, for such purpose, in a sinking fund, a portion of the rent to be received, and dividing the balance among stockholders; renewing the debt or some portion of it when it becomes due in 1890; but assuring the payment of all indebtedness by or before the expiration of the lease.

ON REPORT.

Bill of interpleader against the city of Belfast and the other preferred stockholders of the plaintiff corporation.

An interlocutory decree was made, directing that the city of Belfast interplead with the other defendants, named in the bill; and that the case proceed upon the bill and answer of the city of Belfast, taken as a bill, and the answer of the other defendants, taken as an answer, the city of Belfast having, by its answer, substantially adopted the allegations of the bill.

The case was then reported to the law court on bill, answer and agreed statement.

The opinion states the facts.

*Drummond and Drummond* and *R. F. Dunton*, city solicitor, for the city of Belfast, cited: *Bates* v. *And. & Ken. R. R. Co.* 49 Maine, 491; *B. & M. L. R. R. Co.* v. *Unity*, 62 Maine, 148; *Revere* v. *Boston Copper Co.* 15 Pick. 363; *Lockhart* v. *Van Alstyne*, 31 Mich. 76; *Taft* v. *Railroad Co.* 8 R. I. 310; *Williston* v. *M. S. & N. I. R. Co.* 13 Allen, 400; *St. John* v. *Erie R'y Co.* 22 Wall. 136; *Union Pacific R. R. case*, 99 U. S. 402; *Sioux City & Pacific R. R. Co. in error* v. *United States*, decided in the United States Supreme Court, January 21, 1884.

Counsel concluded: We think we have established the following proposition :

1. That the preferred stockholders are merely stockholders in the corporation and not creditors of the corporation, and, there-

fore, the rights of creditors to the property of the corporation are superior to the rights of the preferred stockholders as fully as they are superior to the rights of the common stockholders.

2. That as between the two classes of stockholders, the debt is a burden equally upon both classes; that neither can throw the burden of the debt upon the other; but that both must contribute to its payment.

3. That dividends can be made to the preferred stockholders only when they can be made to both classes, provided the net earnings are sufficient; that is to say, the preferred stockholders cannot have a dividend and at the same time require that the portion of the earnings which would go to the common stock if there was no debt, be applied to the payment of the debt.

4. That a dividend can be made from the net earnings only when there are net earnings which can properly be applied to a dividend on stock, without regard to whether it is preferred or non-preferred stock.

5. That the city as a holder of stock has a right to object to the claim of the preferred stockholders to have dividends made to them and the balance of the earnings carried to the sinking fund; and has the right to require that all the net earnings shall be carried to the sinking fund until the debt shall be paid.

II. But if the city has no right as a holder of common stock, to object to this claim of the preferred stockholders to have the net earnings paid to them in dividends, we hold that it has such right as a creditor.

We have already shown that all the net earnings will be required to make a fund sufficient to pay the debt of the city when it becomes due.

There can be no doubt that the city, as a creditor, has the right to be paid even though no dividends are paid; its rights as a creditor are superior to those of any stockholder as a stockholder. The city then has the right to resist the claim of the preferred stockholders, and to demand that the action of the directors, in making provision for the payment of the debt to the city when it matures, shall be sustained.

*S. C. Strout, H. W. Gage* and *F. S. Strout,* for the preferred stockholders, cited : *B. & M. Railroad* v. *Brooks,* 60 Maine, 577 ; *A. & M. Turnpike Corp.* v. *Gould,* 6 Mass. 40 ; *K. & P. R. R. Co.* v. *Kendall,* 31 Maine, 474 ; *B. & M. Railroad Co.* v. *Moore,* 60 Maine, 567 ; Am. L. Review, January, 1884, p. 50 ; *Taft* v. *H. P. & F. R. R. Co.* 8 R. I. 310 ; *Thompson* v. *Erie Railroad,* 42 How. (N. Y.) Pr. Rep. 93 ; *In re Bangor, &c. Slab Co.* L. R. 20 Eq. 59 ; *Burt* v. *Rattle,* 31 Ohio St. 116 ; *Davis* v. *Prop'rs Church in Lowell,* 8 Met. 321 ; *Lewey's I. R. R. Co.* v. *Bolton,* 48 Maine, 455 ; Redf. Railways, § 237 ; *March* v. *Eastern R. R. Co.* 43 N. H. 515 ; *Oldtown & L. R. R. Co.* v. *Veazie,* 39 Maine, 577 ; 2 Story's Eq. § 1231 ; *Nickals* v. *N. Y. L. E. & W. R. R.* 15 Fed. Rep. 579 ; *Union Pacific R. R.* v. *U. S.* 99 U. S. 496 ; *St. John* v. *Erie Ry.* 10 Blatch. 279 ; S. C. 22 Wall. 148 ; 31 Mich. 79 ; Morawetz, Corporations, § 405 ; *Henry* v. *Great Northern R. R.* 1 DeG. & J. 606 ; *Sturge* v. *Eastern Union R. R.* 7 DeG. M. & G. 158 ; *Williston* v. *Michigan Southern,* 13 Allen, 405 ; Green's Brice's *Ultra Vires,* 164, 173 ; *Bates* v. *And. R. R.* 49 Maine, 503 ; *Corry* v. *Londonderry R. R.* 29 Beav. 263, (30 L. J. (Ch.) 290) ; Jones, Railroad Securities, § 620 and cases ; *Matthews* v. *Great Northern R. R.* 5 Jurist. N. S. 284 ; *Webb* v. *Earle,* 20 Law Rep. 556 ; *W. C. & P. R. R.* v. *Jackson,* 77 Pa. St. 325 ; 1 Lindley, Partnership, (2 ed.) 781 ; *Barnard* v. *Vt. & Mass. R. R.* 7 Allen, 521 ; *Pratt* v. *Pratt,* 33 Conn. 446.

Counsel concluded : We think we have established the right of the preferred stockholders to a six per cent dividend while the Maine Central lease is in force, and that they are entitled to a decree of this court, as prayed for in their answer that a semi-annual dividend of three per cent be paid from the rental received in November, 1882, now in possession of the corporation, and a like semi-annual dividend from the rental, as and when received by the corporation, pending said Maine Central lease and the existing indebtedness of the corporation, be borne and paid by the corporation, without burden upon the preferred stockholders.

PETERS, C. J.   The plaintiffs were incorporated as a railroad
company in 1867, the charter authorizing the issuing of preferred
and non-preferred stock.   The company was organized and
by-laws were established prior to opening the books for the
subscription of shares.   The eighteenth by-law was this:
"Dividends on the preferred stock shall first be made semi-
annually from the net earnings of said road, not exceeding six
per centum per annum, after which dividend, if there shall remain
a surplus, a dividend shall be made upon the non-preferred stock
up to a like per cent per annum; and should a surplus then
remain of net earnings, after both of said dividends, in any one
year, the same shall be divided *pro rata* on all the stock."

The first question is, whether those who subscribed for
preferred stock became entitled to it according to the terms of
the by-law.   We have no doubt of it.   There was nothing else
anywhere to indicate what the preferred stock was to be.
Subscribers merely agreed to take preferred stock, others
subscribing for common stock.   The by-law, or the terms stated
in it, must be regarded as a part of the contract entered into by
the corporation and the subscribers.   The by-law describes and
identifies the stock.   *Davis* v. *Proprietors*, 8 Met. 321.

Other questions in the case are involved in the following facts:
It appears that, in the early days of the enterprise, a policy was
resolved upon to build the road wholly from subscriptions to
stock.   In the first place the city of Belfast, through its govern-
ment, expressed its view that the construction of the road should
not be commenced until stock enough should be subscribed to
secure its completion, and that no mortgage should ever be put
upon the road.   After that, the railroad company, by its vote,
committed itself to the same policy.   And, after that vote, the
company adopted this by-law: "Nor shall any assessment what-
ever be made upon any shares, or any portion thereof, until the
full amount of the estimated cost of the road . . . shall
have been subscribed by responsible parties in accordance with
the rules and regulations of the directors," &c., &c.   One of
those rules, made a part of the subscription paper, reiterated the

idea before expressed, with these words added thereto, "thereby avoiding the necessity of any mortgage or encumbrance being ever contracted by this corporation. "

Thereupon subscriptions were made for both kinds of stock. Without wading through the historical details which caused the departure, it is enough to say that the original theory of the company was not adhered to. Without the fault of the company, unforeseen exigencies arose, imperatively requiring a large amount of indebtedness to be created. The collected subscriptions amounted to $648,100 : while the cost of the road exceeded a million dollars. Stock was issued for those shares in 1870, after fully paid for, and no other shares were ever issued. To avert the disaster that would have fallen upon them without it, the corporation was compelled to obtain means, to finish the construction of the road, in several ways. On May 15, 1870, a bonded indebtedness for $150,000 was created, payable in twenty years, with interest semi-annually, secured by mortgage upon the road. The company also borrowed of the city of Belfast, its principal stockholder, and gave its note therefor, dated November 16, 1871, the sum of $101,900, payable, with annual interest, on November 16, 1885. Besides these amounts, the company incurred a miscellaneous floating indebtedness of about $150,000 more. It being admitted that these debts were all legally incurred, a discussion of the difficulties which were encountered in obtaining the credits, would not be material to the issue.

In April, 1870, the company leased its road to the Maine Central Railroad Company for a term of fifty years, from May 10, 1870, at a rent of $36,000 per annum, payable one-half thereof on the tenth days of May and November, in each year during said term, the lessee to operate the road, keep it in repair, and pay all taxes assessed thereon. The road has been possessed and operated by the lessee ever since. When this lease terminates, it is not probable that the road will be able to earn much more, if anything, than its operating expenses. By means of the rent received, the company had paid off all of its floating or miscellaneous liabilities, and something on the city debt, so that on

November 10, 1882, after receiving the November rent, the financial standing of the company was substantially as follows: It owed $150,000 in bonds, maturing in May, 1890. It owed the city of Belfast $87,900. Its sinking fund amounted to $26,-033.24. And it had in its possession $10,863, remaining after paying interest then due upon the note and bonds.

Out of the payments of rent received from November, 1878, to May, 1882, both inclusive, the company paid semi-annual dividends, of two and one-quarter per cent each, to the holders of the preferred stock, but paid nothing upon the common stock, and has refused to declare any further dividends. A dispute arising between the two classes of stockholders whether the preferred stockholders were entitled to any dividend from the surplus on hand of $10,863, this bill was filed in order to determine the question.

Upon these facts, affected somewhat by other incidental facts which will appear, the position is taken, by the counsel for the city, that the preferred stockholders, as between themselves and the common stockholders, are not entitled to any dividends until the entire indebtedness of the company is paid; that, inasmuch as the subscriptions to both classes of stock were made when the declared policy of the corporation was not to create a corporate debt, with the then full expectation by all parties that none would be created, and inasmuch as the debts were unavoidably incurred for the common benefit of all stockholders, the burden of removing the debts should be borne by all the shares alike, and not fall exclusively upon the common stock. The city contends that the favored class were to be preferred stockholders only upon the condition that there should be no debts, that there was an implied contract to that effect; or, if not a contract, that such a result is demanded by a natural and necessary equity which flows from the relation of the parties.

We think such a position is not tenable, as a claim either in law or equity. The subscribers must have known, if they reflected at all about it, that corporate indebtedness might become necessary in spite of the strongest pledges to the contrary. In fact, the twelfth by-law implies that debts might be incurred.

It is said that the holders of the preferred stock favored a bonded debt. But it was not upon any condition that they should surrender any right thereby. All stockholders favored it. There was no voice against it. If A has the first and B the second mortgage on a vessel, taking their securities at the same time, anticipating no disaster to the vessel, and a disaster comes, requiring a bottomry bond upon the property, the payment of such bond is not a burden common to the two mortgages. The illustration may not be inapt.

The main question of the case is whether, in November, 1882, the financial condition of the company was such that the preferred stockholder was then legally entitled to a dividend.

No such claim could have been made upon the ground that he is a creditor of the company; he is not such. Preferred stockholders, ordinarily, are not creditors. That is the common doctrine of the authorities. *Chaffee* v. *Railroad*, 55 Vt. 110, and numerous cases cited.

It was not intended in the present instance to guarantee a dividend. If a dividend is prevented in any one year by a deficit of earnings, it can not be made up from the earnings of succeeding years. A six per centum dividend is not assured by the contract of subscription. It may be less. The implication of the by-law is clear that there is to be no surplus of profits to be carried from one year to another. The net earnings are to be wholly distributed each year. The language of the by-law is really the language of the general law. It promises dividends whenever there are net earnings from which to make them.

The difficulty is in deciding what should be considered as net earnings; that is, net earnings such as are applicable to dividends. In a general sense, net earnings are the gross receipts less the expenses of operating the road to earn such receipts. But several kinds of charges must first come out of net earnings before dividends are declared. The creditor comes in for consideration before the stockholder. The property of a corporation is a trust fund pledged for the payment of its debts. Therefore, if there is a bonded, funded, permanent or standing debt, the interest on it must be reckoned out of net earnings. If there is a floating

debt, which it is not wise and prudent to place in the form of a funded debt, or to postpone for later payment, that should also be paid. If the financial situation of the company is such as to render it expedient to commence or continue the scheme of a sinking fund for the extinguishment of the company's indebtedness some day or other, an annual contribution out of the net earnings for that purpose would be reasonable. These deductions made from the net earnings, the balance will be the profits of the company distributable among stockholders. In Pierce on Railroads, 125, it is said : " The dividends on preferred stock are payable only out of net earnings which are applicable to the payment of dividends ; and the interest on the bonded or other interest bearing debt, even though contracted after the issue of the preferred stock, and the rent upon leases made after the issue thereof, shall be first paid. " The definition of net earnings, above given, is supported by the authorities. *Chaffee* v. *Railroad, supra,* and cases cited ; *Taft* v. *Railroad,* 8 R. I. 310 ; *St. John* v. *Erie Railway Co.* 10 Blatch. 271 ; S. C. 22 Wall. 136 ; *Union Pacific R. R.* v. *United States,* 99 U. S. 496.

But it does not necessarily follow that debts should be first wholly paid, before a declaration of dividends, merely because they are of a floating character. It may be that it would be reasonable and proper to convert such liabilities into a funded debt. Nor does it follow that all of the income of a road may not be needed for the payment of its funded or standing debt. All depends upon the financial resources and abilities of the corporation and the prospects of its road. Where it can be safely done, considering the interests of the company's creditors, and of all persons concerned, the general practice of railroads, has been to include with expenses chargeable to capital those which are incurred in the original construction of the road. And the courts have admitted the reasonableness of the rule. The idea is that the capital paid in and the capital borrowed unitedly produce the earnings, and that a share of the same should be accorded to each. The distinction between expenses for construction and ordinary expenses is maintained in the leading cases. See cases *supra.* *Corry* v. *Railroad Co.* 29 Beav. 263 ;.

*Bouch* v. *Railroad Co.* L. R. 4 Ex. Div. 133. *Mills* v. *North-ern R. Co.* L. R. 5 Ch. App. 621; Pierce R. R. 125, and cases in notes. In the case last cited (*Mills* v. *Railroad Co.*) Lord HATHERLY, L. C., said, "Mr. Dickinson started a very curious theory, which, I apprehend, never found its way into any mer-cantile arrangement—that there never can be any available income, or any profit, so long as there is any debt remaining unpaid. If that be so, I suppose there is hardly a railway in the kingdom which could pay any dividends at all to their stockholders." "The whole scheme of railway arrangements, as I understand them, has always been this, that the companies are authorized to raise part of their capital by shares, and to raise further capital by means of borrowing to the amount of one-third of the whole capital."

In the case before us the company has no ordinary expenses beyond a small sum necessary to support its organization. What sum then shall be taken from its earnings to be paid to or be set aside for its creditors. One side says, all its earnings; and the other side says, set aside annually a sum which with accumula-tions will insure the payment of all the corporate indebtedness by 1920, the date of the end of the lease.

As a general rule, the officers of a corporation are the sole judges as to the propriety of declaring dividends, and the courts will not intefere with a proper exercise of their discretion. The company usually establishes its financial policy for itself. Yet when the right to a dividend is clear, and there are funds from which it can properly be made, a court of equity will interfere to compel the company to declare it. Directors are not allowed to use their power illegally, wantonly or oppressively. See cases *supra*. Also *Williston* v. *Railroad Co.* 13 Allen, 400; *Board-man* v. *Railroad*, 84 N. Y. 157; *Jermain* v. *Railroad*, 91 N. Y. 483. In the present case we are by all the parties invited to accept jurisdiction; the facts are agreed; and all technicalities are waived. We may adopt such a standard of judgment, in determining the question, as we think would and should regulate the exercise of the sound discretion of directors, acting in good faith, in deciding the same question. *Barnard* v. *Railroad*, 7 Allen, 512, 521.

Two facts are very much relied upon by the preferred stockholders as favoring their contention. One is an amendment to the 18th by-law, passed by the corporation in July, 1879, which is this : "The words 'net earnings,' as used in this section (by-laws), shall be construed to mean all the surplus remaining after the payment of the necessary incidental charges and expenses, the interest on the mortgage and funded debt, and such provision for payment of the maturing obligations of the corporation as in the judgment of the directors may be necessary ; and for this latter purpose, the directors shall establish a sinking fund, to be maintained in such form and manner as they may deem for the best interest and safety of the corporation." This in 1882 was repealed.

The other fact is, that when the subscribers for preferred stock, not including the city of Belfast, paid their subscriptions, not being under strict legal obligation to do so, they were induced to make the payment, by the corporation securing to them semi-annual six per cent dividends, and the final payment of their stock, by means of bonds with coupons, covered by a second mortgage on the road, — which bonds and coupons were taken as collateral to the stock and dividends. This mortgage was, however, afterwards cancelled for prudential reasons and with the consent of all parties interested.

The counsel for the city contends that those proceedings, afterwards annulled, are to have no more effect upon the present question than if never existing. We do not concur in that position fully. We think as admissions, as expressions of a policy inaugurated and for a long time acted upon by the company, they serve to impress upon the claim of the preferred stockholders at least an appearance of equity.

After a full consideration of all the evidence and theories presented to us, we incline to the conclusion that the directors would be justified in refusing to make any further dividends, until enough money has been accumulated, from the rent and the sinking fund, to pay the note to the city of Belfast. When the company receives from its lessee the rent due in May, 1885, it will have money enough with which to pay the note, and a few thousands more.

There are quite significant reasons for drawing a line at the point indicated. The note may well be considered as given for temporary purposes, in anticipation of rents receivable. The company really has no credit which would enable it to renew the note, inasmuch as its outstanding mortgage covers all its property. It looks as if the note represents a sort of forced loan from the city, and as given for money that could not have been obtained from any other source, the city borrowing it for the purpose of loaning it, being induced to do so on account of her immense interests involved as a shareholder. She now asks for her money, being unwilling to renew the note, and she is entitled to its payment. The corporation would find it difficult to borrow it elsewhere. It would look like borrowing money to pay dividends.

There are much more forcible reasons for the corporation to hold its moneyed resources in reserve until the note to the city is paid than there are for afterwards continuing the same policy until the debt of $150,000, due in 1890, is paid. The two debts stand upon a different footing. The latter is a bonded mortgage debt, no part of which is due, and which undoubtedly can be wholly or partially renewed when it becomes due. It fairly represents a part of the original cost of constructing the road. The company has thirty-five years or more of assured rent with which it can pay the amount. It has no other debt, after paying the note to the city, present or prospective. It has evidently regarded that amount as a permanent or standing, interest bearing indebtedness. To renew the mortgage or a portion of it, when it becomes due, we think would be regarded in a mercantile sense as a reasonable, safe and conservative calculation. The preferred stockholders were to have semi-annual dividends, if earned. They should have them, if they can be declared without the least peril to the company or any of its creditors. Belfast herself owns all the preferred stock but about $100,000, there being over $380,000 of it in all. We think that, after the note is paid, the directors may well make some reasonable provision for the final extinguishment of the mortgage debt by reserving therefor a portion of the rent to be received under the lease, and divide the balance among stockholders.

A scheme could be perfected by an expert in such matters, by which there may be a yearly contribution to a sinking fund, which, with its accumulations, will discharge all the indebtedness within a reasonable time before the lease expires, and pay more or less dividends in the meantime ; or, before or by the year 1890, a new bond could be put upon the market, a certain portion to be paid annually, such portion to be designated by lot or in some other way, which might accomplish the same end as effectually.

We need not be minute in any details inasmuch as our observations in this respect are not intended as anything more than illustration or argument. The bill commits to us power over only the sum of $10,863, which came from a payment of rent in November, 1882, and that sum, as already indicated, may properly be applied by the company upon its debt.

Under the circumstances of the case, no costs to be recovered by any party.

*Decree according to the opinion.*

WALTON, VIRGIN, LIBBEY, FOSTER and HASKELL, JJ., concurred.