## CHARLES B. HAZELTINE and others

*vs.*

## BELFAST and MOOSEHEAD LAKE RAILROAD COMPANY and others.

## Waldo. Opinion June 6, 1887.

*Railroad corporations. Dividends. Net earnings. Preferred stock, when court will order dividends upon.*

Holders of preferred stock in the Belfast and Moosehead Lake Railroad Company are entitled to a dividend from net profits each year during which they are earned, but not, under the terms of their subscription, to cumulative dividends; the arrearages of one year are not payable out of the earnings of subsequent years; the inquiry is, whether earned during the particular year for which they are demanded.

While the prospective wants and liabilities of a railroad corporation may be taken into account in ascertaining whether net profits have been earned from which the corporation can afford to declare a dividend, directors are not justified in refusing to declare a dividend to preferred stockholders from earnings on hand, merely because the corporation cannot pay all of its funded mortgage indebtedness at maturity if dividends be paid; other conditions are to be considered.

The court will compel a corporation to declare and pay dividends on preferred stock, when the question becomes one more of right to be determined by the law than of discretion to be determined by the directors, and the directors refuse to perform their legal duty.

The defendant corporation owes nothing but a bonded mortgage debt of $150,000, to mature in 1890; the common stock is $380,400, and the preferred $267,700; the road cost $1,050,000; the earnings of the road have paid off an indebtedness of $251,900, which entered into its construction, the reduction commencing in 1871, and terminating in 1885, leaving in the latter year $22,412.32 cash assets on hand; the expenses of the corporation are trifling beyond the payment of $9,000 annually as interest on the bonded debt; the road is under lease until 1921, at an assured rent of $36,000 per year, the lessee running the road at its own risk and expense, and keeping it in repair and paying all taxes thereon; the corporation has the ability,

upon the strength of the lease, or on the value of the road, to renew a portion of the debt, or all of it, upon advantageous terms; and the preferred shareholders have been for many years deprived of dividends to enable the corporation to consummate the payment of its debts.

*Held*, under these and other less important facts, that the preferred stock is entitled to a full annual dividend from the balance of earnings remaining on hand at the expiration of the year 1885.

ON report.

Bill in equity, heard on bill, answer and agreed statement. The opinion states the facts.

*William H. Fogler*, for the plaintiffs, cited : *Belfast & M. H. L. R. R. Co.* v. *Belfast*, 77 Maine, 445 ; Morawetz, Corp. (2 ed.) § § 440, 441, 459 ; Green's Brice's *Ultra Vires*, 164 ; *Richardson* v. *Railroad Co.* 44 Vt. 613 ; *Kent* v. *Quick Silver Mining Co.* 12 Hun. 53 ; *Barnard* v. *Railroad Co.* 7 Allen, 521 ; *Boardman* v. *Railroad Co.* 84 N. Y. 157 ; *Thompson* v. *Railroad Co.* 45 N. Y. 468 ; *Prouty* v. *Railroad Co.* 1 Hun, 655 ; *Beers* v. *Bridgeport Co.* 42 Conn. 17 ; *Pratt* v. *Pratt*, 33 Conn. 446 ; *Scott* v. *Eagle Fire. Co.* 7 Paige, 203 ; *Jermain* v. *Railroad Co.* 91 N. Y. 483 ; 1 Story, Eq. Jur. § 28 ; 1 Pom. Eq. Jur. § 109 ; *Nickals* v. *R. R. Co.* 15 Fed. Rep. 575.

*Drummond and Drummond*, for defendants.

The condition was that no assessment (except for preliminary survey and location) should be made, nor any work be commenced "until the full amount be secured for its completion to Newport." The design of this provision and the result expected from it are expressly stated (as if to avoid any possible question) "thereby avoiding the necessity of any mortgage or incumbrance being ever contracted by this corporation."

To prevent the violation of such a contract, a single stockholder may maintain a bill in equity against the directors, the corporation, or the other stockholders. Wood's Field on Corporations, § 361.

"The holder of a certificate does not thereby become a creditor of the corporation, and cannot maintain an action at law against the corporation for a failure to declare and pay dividends." Wood's Field on Corporations, § 107.

We admit however, a distinction between the two classes of stock as stated by the same author. *Id.* § 108.

In a recent case in the New York Court of Appeals, in which a stockholder brought a suit to compel it to declare a dividend, the corporation had thirty-six thousand dollars on hand; it owed seventy-five thousand dollars due in seventeen years; the corporation had no immediate need of the surplus on hand, or of its earnings, except to pay the current expenses, which including interest on the debt were about ten thousand dollars a year; the court say: "The property of every corporation, including all its earnings and profits, belongs, primarily, to such corporation, exclusively, and not to its stockholders, individually or collectively. They have a certain claim, it is true, but their claims are always subordinate to the claims of creditors, and the latter approach much nearer to the condition of ownership than the former. No stockholder can entitle himself to any dividend, or to any portion of the capital stock, until all debts are paid. The funds on hand, which the plaintiff asks to have divided and distributed among the stockholders, are only about half sufficient to pay the indebtedness of the defendant. It is no sort of consequence, in a legal point of view, that the debt is not yet due, and has a number of years to run before it matures. The creditors still have the better right to the funds, which the defendant holds for them in trust. The court cannot undertake to say, judicially, that the future business of the corporation will be prosperous, nor has it any right to postpone the rights and claims of creditors to future earnings and accumulations, even if it could be certain they would accrue. The board of directors, in their discretion and in view of all the facts within their knowledge, might do this, but no court, I apprehend, would ever undertake to deal in such a manner with the funds of the corporation which was indebted to an amount, at least double the fund sought to be distributed. *Karnes* v. *Rochester Railroad Co.* 4 Abb. Pr. (N. S.) 109, cited by Wood, § 93.

But it is said that the object of the directors is to help the non-preferred stockholders; to this we reply that it is their duty to promote the rights of those stockholders; but beyond that,

if the directors are performing their duty and acting within the scope of their rights, it matters not what their motive may be.

Counsel claims that this is *res adjudicata*, covered by *Belfast, &c. R. R. Co.* v. *Belfast*, 77 Maine, 445. But so far as the decision in that case goes, it sustains our position in every respect. It is the settled rule both at law and in equity that the property of the corporation is held primarily for the payment of the debts of the corporation. See Wood's Field on Corp. § 365. It is often said that dividends cannot properly be made until the debts have been paid. *Ibid* and cases cited. Our statute, chapter 46, § § 46, 47, recognizes this principle, and the payment of dividends when a debt of such magnitude is so soon to become due is in violation of its spirit, if not of its terms.

PETERS, C. J. The facts of this case and most of its questions were before the court in the case of *Belfast, &c. R. R. Co.* v. *Belfast*, 77 Maine, 445. The preferred stockholders of the company are now complainants against the company and its directors, seeking to obtain through a court of equity dividends on their stock.

On March 20, 1886, when this bill was brought, the following facts existed : The road was, and since May 10, 1871, had been leased to the Maine Central Railroad Company, the lease to run until May 10, 1921, the lessee to operate the road during the intervening period at its own risk and expense, to keep it in repair and pay all taxes thereon, and pay a rent of $36,000 per year.

The common stock amounts to $380,400, and the preferred to $267,700, all paid in, amounting at par value to $648,100. The road cost $1,050,000. The means expended for its construction, besides stock paid in, consisted of a bonded debt of $150,000, a floating debt of $150,000, and an indebtedness to the city of Belfast, the principal stock-holder, of $101,900 for borrowed money. The bonded debt is secured by mortgage on the road, the principal of which will mature May 15, 1890, having existed in the same form since May 15, 1870, the interest thereon having been regularly

paid semi-annually. It is the only debt existing against the company, nor is it pretended that any other can arise against the company from this time to the end of the lease in 1921. The company's expenses are trifling, being only such as are necessary to keep up a formal corporate organization. The floating debt had been wholly extinguished, the borrowed money paid, and there were in the treasury $22,412.32 of cash assets, all from rents received under the lease, at the date of this complaint.

At that time the directors had laid aside out of money on hand $19,900 which, with future rents, might be available as a reserve fund wherewith to pay the bonded debt when it matures in 1890. But before this appropriation, which can easily be recalled, the complainants had used due diligence, in the way of demands, notices, motions and other movements, to obtain from the directors a recognition of their equitable right to a dividend.

Three questions arise on the facts. First: Are the preferred stockholders entitled to annual dividends, if earned? Second: At the date of the bill had dividends been earned? Third: Is this a case authorizing the court to require the directors to declare a dividend?

While all of these questions were hardly before the court in the former case, to be directly adjudicated, still they were necessarily involved in it, and we then considered them carefully, hoping the parties would be satisfied with the results which were foreshadowed, without proceeding with further litigation. We then indicated that we were of the opinion that the preferred stockholders would be entitled to dividends after the floating debt became paid, and, after considering the questions anew, we at this time see nothing to require us to change that opinion.

There can be no possible doubt that the obligation of the company to the privileged shares rests on by-law 18, and that the by-law establishes the terms of a contract between company and stockholders. We have already so decided.

The by-law runs thus : "Dividends on the preferred stock shall first be made semi-annually from the net earnings of the road, not exceeding six per centum per annum, after which dividend, if there shall remain a surplus, a dividend shall be made on the non-

preferred stock up to a like per cent per annum ; and should a surplus then remain of net earnings, after both of said dividends, in any one year, the same shall be divided *pro rata* on all the stock."

The construction which we gave to this contract in the previous case, was certainly very liberal towards the holders of the common stock, and all the doubts were weighed in their behalf, in the decision that the preferred stock was non-cumulative. Had the by-law merely provided that the preferred shares should be entitled to a dividend of six per cent annually when earned, the arrearages of one year would have been payable out of the earnings of subsequent years, and there would have been no occasion for the present controversy between the two classes of stockholders. There is no question among the authorities on this point. Jones, Railway, § 620. Morawetz, Cor. 2d ed. § 458. Cook, Stock and Stockholders § 272. The latter author, in a note to § 269 of his work, published in 1887, cites *Belfast, &c. R. R Co.* v. *Belfast,* 77 Maine, 445, *supra,* as inconsistent with the general rule, but states the ground for the variance ; that, inasmuch as the by-law implies that the entire net earnings of each year should be paid out in dividends, a deficiency of preferred dividend in any year, could not be made up in subsequent years.

The next question is whether the money on hand shall be regarded as net earnings out of which a preferred dividend should be paid ; and the question has been discussed, secondarily, as to what extent future earnings under the lease will come under the same head. This point depends usually on several considerations—is a relative question—not always susceptible of clear demonstration—and is a matter to a considerable extent of good judgment in conducting the company's business and of good faith in upholding its contracts on the part of directors.

All the cases in which an inquiry has arisen concerning the propriety or legality of paying preferred dividends, where the contract is to pay as often as annually if there are annual earnings, concur in this, that the inquiry must be whether net profits have been earned in the particular year at the expiration of which dividends are demanded. The future wants and liabilities of

the company may, no doubt, be taken into the calculation to a certain extent, as will be more fully explained hereafter.

We think that under any of the approved definitions of net earnings, meaning such net earnings as are applicable to dividends, the complainants make out a case.

Certainly, in a literal view, there must be net earnings each year till 1890, if not up to the end of the lease. For the bills payable are $9,000 per annum, a trifle only more, and bills receivable are $36,000, leaving $27,000 balance on hand each year. The preferred dividend would be $16,062 per annum, leaving about $11,000 in the treasury annually. This balance cannot now possibly be paid on any debt of the company. It is only claimed by the respondents that in the future it may be so used.

In *Hill* v. *Supervisors*, 4 Hill, 20, it is said, "Profits generally mean the gain which comes in or is received from any business or investment where both receipts and payments are to be taken into account." The case of *Dent* v. *London Tramway Co.* L. R. 16 Ch. Div. 344, strongly resembles the present case on this point. There, as here, the preference dividends were dependent upon the profits of the particular year only. JESSEL, M. R., says, "That means this, that the preferred shareholders only take a dividend if there are profits of the year sufficient to pay their dividend. They are co-adventurers for each particular year, and can only look to the profits of that year. If they are lost for that year, they are lost forever. Profits for the year mean the surplus receipts after paying expenses and restoring the capital to the position it was in on the first day of January of that year." *Elkins* v. *Camden and Atlantic Railroad Co.* 36 N. J., Eq. decided in 1882, presents questions similar to the present, and announces the rule that the preferred stockholders' "rights are to be governed and regulated each year by the pecuniary condition of the corporation at the close of the year."

In Morawetz on Corporations, 2d ed. § 459, an approved work, the doctrine is stated: "The directors of a corporation have a discretionary power to withhold profits from the holders

of common shares in order to accumulate a surplus, etc. ; but it is the duty of the directors to pay the preferred shareholders their promised or guaranteed dividends, whenever the company has acquired funds which may rightfully be used for the payment of dividends. This rule applies with peculiar strictness where the preferred shareholders are entitled to receive their dividends annually out of profits earned during the current year only, and a deficit in any year does not become payable out of subsequent profits."

But apply to the question the definition of net profits which would be regarded as the most liberal to the company, or the holders of the common stock ; allow that there must be net profits such as should be applied to dividends ; and that funds may be kept on hand sufficient to make reasonable provision for both the present and future necessities of the company. A very much quoted definition, as applicable to railroad corporations, is that formulated by Mr. Justice BLATCHFORD in *St. John* v. *Erie Railroad Company,* 10 Blatch. 271, "Net earnings are, properly, the gross receipts less the expenses of operating the road to earn such receipts. Interest on debts is paid out of what thus remains, that is, out of net earnings. Many other liabilities are paid out of the net earnings. When all liabilities are paid, either out of the gross receipts or out of the net earnings, the remainder is the profit of the shareholders to go toward dividends which in that way are paid out of the net earnings." This definition was substantially repeated in *Warren* v. *King,* 108 U. S. 389, Mr. Justice BLATCHFORD, upon another bench, delivering the opinion, and asserting that, "while the rights of a preferred stockholder are not to be superior to the rights of creditors, they are nevertheless enforceable against the company according to the terms of the contract made by them." We refer to the views to which we committed ourselves upon this branch of the case in 77 Maine, p. 452, before cited.

It will be noticed that the definition of net profits, in the case of railroad corporations, which are generally more heavily in debt than other kinds of business corporations, calls for the payment of interest on the company debt, but not necessarily

for payment of any portion of the principal. At this point the parties come to a closer issue and really to the turning point of the controversy. And that is, whether the bonded debt of $150,000, due in 1890, must be first wholly paid before any declaration of dividends. The respondents so contend. The complainants contend that, in ascertaining net profits, a portion only of the earnings should be reserved for the payment of the debt, and that the debt, or some portion of it, when it comes due, should be extended in some form.

The authorities, on the subject of ascertaining what are the annual net profits or earnings of a railroad corporation, perhaps, without exception, make a distinction between the payment of its floating debt and the payment of its permanent or bonded debt, —between ordinary and extraordinary indebtedness. It is not indispensible, however, that the company be free from the pressure of floating debt before it may lawfully pay dividends, even to holders of its non preferred stock. It may, even, under some circumstances, borrow money to pay dividends. Morawetz, Cor. 2d ed. § 438, and cases.

In many cases there is difficulty in ascertaining what the actual condition of a company may be. None exists here. There could not well be an instance of less complicated affairs. The business of the company is guaranteed, its amount of income fixed, its expenses are nominal, and its freedom from all the liabilities and risks usually incident to the management of a railroad is assured, for the next thirty-three years.

In every sense this last debt of $150,000 is a permanent debt. It is a bonded, mortgage and interest-bearing debt. The lease secures it many times over. The road itself is an absolute security for it, and undeniably for much more. It is a permanent debt for another reason. It entered into the construction of the road and is represented in its permanent property. A distinction between expenses for construction and ordinary expenses is maintained in the leading cases on this subject. The argument is that capital paid in and capital borrowed unitedly produced the earnings, and that a proportionate share of the earnings should be accorded to each. 77 Maine, before cited,

p. 453. In that view the bonded debt earns but $9,000 per annum of the $36,000 earned in all.

It will be readily seen that there are special reasons for deeming the complainants' claim equitable. They have been required to remain in waiting for dividends for many years, in order that a large amount of the company's indebtedness, say $250,000, should be first paid, quite an exacting construction against them being required to produce such result. The company or its common shareholders would have suffered no injustice had the debt to the city of Belfast, been placed in a permanent funded form. Another thing, before spoken of, which favors the complainants, is, that by our former opinion their dividends were held to be non-cumulative, and if lost now are forever lost. Still another thing may be of importance enough to be taken into account, and that is that the corporation is paying six per cent interest on its bonds, and receives about one-third interest on the sums which it proposes to keep on hand.

The respondents go further than to deny that net profits have been or will be earned; they contend that they should not be divided even if they have been earned. Of course all the net earnings of an indebted company should not always be devoted to dividends. We think a company should have a right to base its calculations upon a final payment of its debts at some time. But steps in that direction are not to be untimely, or oppressive to other interests, and should be such as not to unreasonably interfere with the expectations or interests of stockholders, and such as will not prevent a reasonable performance of all other obligations which have been assumed by the company. The more practical question is, as to how far the earnings shall be reserved and how far divided. But it comes round to the primary question, which is, have net profits been earned, such as are reasonably applicable to dividends? The argument of the learned counsel for the respondents seems to proceed upon the idea that the complainants have a prior right to receive dividends only whenever they have been actually declared, but that the company has the right to refuse to declare dividends, whether they have been earned or not. Such is not

the letter or spirit of the contract entered into. The promise of the company was, that dividends semi-annually from net earnings "shall be made."

But when the present mortgage debt of $150,000 was established it was to be paid in twenty years, and shall it not be paid at the end of that time, asks counsel? It may have been supposed that twenty years would be long enough for the debt to run without a renewal. But if it was even supposed that the debt could be conveniently paid at maturity without renewal, was it not calculated by the parties that dividends would be in the meantime distributed to the preferred stockholders? The result only proves a miscalculation by the company of its ability to literally perform its obligations. Is it an excuse for not declaring dividends out of net earnings, provided there are net earnings, merely that a company cannot pay an entire bonded debt at maturity without creating a new debt or borrowing again? Is it not reasonable to require the company to keep all its obligations, when they can easily do so? If the company had no means or credit which would enable them to place a new obligation on the market there would be force in the position. But no such inability is or possibly can be pretended. Can it be said that a railroad company makes no net profits in a year in which it gains $36,000 and has only $9,000 to pay out, because it owes $150,000, payable in four years, abundantly secured upon its property, when the company has a perfect credit and abundant means to enable it to replace the old with a new loan on advantageous terms? Does a merchant who carries on business partly on borrowed capital, earn no profits in a year at the end of which, besides retaining his capital, he has received $27,000 more than all he has paid out, simply because he owes a debt for his borrowed capital which he has abundant ability to pay, but not without further borrowing? Says Morawetz, (Cor. § 439) : "In ascertaining whether a company has a surplus which may be divided among the shareholders, permanent improvements made by means of borrowed money may often be valued as counterbalancing the liability of the company for the money used to construct them."

Two cases are relied on for the respondents neither of which appears to us as having any tendency to support their general position. One is *Karnes* v. *Rochester Railway Co.* 4 Abb. Pr. N. S. 107. That case shows that two sets of railroad directors were chosen, and a controversy was going on between them as to which was the legitimate board. Pending that litigation a common shareholder—there was no preferred stock—brought a bill to have all the moneyed assets of the corporation distributed among the stockholders. There were $36,000 in government bonds on hand, the debt was $70,000, due in seventeen·years, the annual expenses were about $10,000, and the bill, which was demurred to, did not allege whether there was any annual balance of profits or not. The court, amongst other grounds of decision, said, that no breach of any obligation on the part of the company to the stockholders, nor any omission of duty, was alleged; that the acts of directors should not be interfered with by courts except to prevent injustice; that the corporation could make no dividends, and the directors were not a party to the bill; that there was nothing to indicate that the money on hand was not needful for the security of the creditors of the company; that it was not even alleged that the directors had refused to make a dividend, nor stated that one, in justice, ought to be made; and the bill was dismissed.

The other case is *New York, Lake Erie & Western Railroad Co.* v. *Nichals*, lately determined in the Supreme Court of the United States, reported in 15 Fed. R. 575. The case was first decided in the circuit court, 21 Blatch. 177, where it was held that the company could not, against the interests of preferred stockholders, divert a large quantity of funds from them to other uses of the company. The decree was reversed in the upper court, not for any difference between the two tribunals as to the law of the case, as stated by the judge below, but upon a difference of opinion in making an application of the law to the facts. The points of the case are correctly represented by the head-notes which are as follows: "The holder of preferred stock is not entitled absolutely to a dividend, even if there be "net earnings' from which such dividend might be paid. The

directors may use the 'net earnings' for the improvement of the road, where such improvement is shown to be imperatively necessary to the preservation of the corporate property, and the continuance of the corporate business." The court were deeply impressed with the uncontradicted testimony of the president of the company, that "but for using the funds in question in that case, the company could not have paid its fixed charges, but would have again gone into bankruptcy, and the entire interest of the stockholders been destroyed." That is unquestionable doctrine. Preferred stockholders are not to be protected to the extent of endangering the rights of creditors, or of wrecking or crippling the enterprise of the road. Clark Stock. § 271. *Culver* v. *Reno, &c. Co.* 91 Penn. St. 367.

The condition of the railroad above alluded to, the Erie system, illustrates the fallacy of the claim that all the earnings of a railroad corporation should be withheld from stockholders until its debts are paid. That company has a capital of over seventy-seven million of common and preferred stock, and an indebtedness exceeding one hundred million of dollars, secured and unsecured. The court need not have troubled itself over the difficulties presented in that case, if it had had the courage to assume that the preferred stockholders were not entitled to dividends until the one hundred million dollars of debt were paid. There is hardly a railroad company in the world that has not a funded debt. Such a rule would work an injustice amounting to cruelty in many cases. Sec. 100, c. 42, R. S., provides that savings banks may invest their deposits in the stocks of any dividend paying railroad in New England. How would the rule contended for work with savings bank deposits invested in Maine Central Railroad stock, a company having $3,600,000 stock and $11,000,000 of indebtedness; or in the Boston and Maine, with a debt of $7,000,000; or in the Boston & Albany, with a debt of $10,000,000; or, if we look out of New England, in the Chicago, Burlington & Quincy Railroad Co., one of the most reputable companies in our country, having more than $80,000,000, of funded indebtedness? What would annuities and life estates be practically worth to the holders of

them in railroad companies, under a rule which allowed no dividends until all debts are paid. The history of railroad enterprises teaches us that the old liabilities of companies are well nigh habitually paid by the creation of new ones, the general design being to lessen the liabilities, which are represented in the construction, by gradual processes.

The last point which the case presents is whether the court can interfere in behalf of the complainants. We think it can and should. The directors refuse to perform a duty. They ignore a contract. They are chosen by the holders of the common stock, who are the majority, and are hostile to the interest of the complainants. We asserted the right of the court in the former case, and there cited authorities in support of it. Says Morawetz (Cor. § 280) : "Where certain shareholders are entitled to privileges which do not belong to the other members of the company, the court will provide a remedy for an infringement of these privileges by the other shareholders of the company's agents." See Cook, before cited, § 541, and cases. Says WHEELER, J., in *Lake Erie, &c. Railroad Co.* v. *Nickals,* *supra,* "when it comes to the question of using the profits which would go to one set of stockholders for the benefit of another set, a more rigid rule should be upheld. The question becomes more one of right to be determined by the law, than one of policy to be determined by the discretion of the directors." When the resolution of directors makes an alteration in the priorities and payments provided in the memorandum of association, it is beyond their power, and may be interfered with by the court. *Ashbury* v. *Watson,* L. R. 30 Ch. Div. 376. Even an action at law was allowed on a contract to make a dividend of earnings. *Bates* v. *Railroad Co.* 49 Maine, 491.

But has the court the power, asks the learned counsel, to prevent a company paying its debt when it becomes due? Not at all. On the contrary, the court would compel the company to pay its debts to the letter. It will also exercise its power in a legitimate case to require the company to keep its other obligations, legal or equitable. While the company does not

owe a debt to the preferred shareholders, it does owe them an obligation, founded upon a contract which is as sacred as any other contract. If the company had not sufficient means or credit with which to pay its debts without applying upon them the funds in question, the funds should be so used. But no creditor makes opposition to complainants' claim, nor have they any occasion to. The creditors must be protected, and so must the different classes of stockholders, according to their respective rights. If the preferred stock is in the way of an earlier enjoyment of dividends by the holders of the common stock, than otherwise would have been, it is an impediment of the company's own creation. The contract to pay dividends on preferred stock, was upon the sole condition that net earnings are possessed by the company. New conditions cannot be imposed by the company alone. Good faith forbids it.

Finally, what shall the decree be? The complainants, admitting that the mortgage debt should be paid within some reasonable time, which must from necessity be somewhat arbitrarily fixed, and adopting the scheme suggested by the court in the former case, ask that a decree be passed allowing dividends for the present and the future for such an amount semi-annually as will not deprive the company of an opportunity of extinguishing its debt within the life of the lease, if it desires to, and of paying dividends to the preferred stockholders during the same period. That would require a calculation which a master, and not the court, should make, and we are inclined to the view that such an extensive decree may not be expedient, all things considered, at the present juncture. The future action of the company may make such a comprehensive proceeding avoidable.

The limited and more direct inquiry is whether on January 1, 1886, the company should have declared a dividend on the preferred stock, requiring therefor the payment of $16,062. We think, as between itself and that class of stockholders, it was possessed of net earnings enough, which by its agreement it had pledged for that purpose. It had $22,412.32 in its treasury; it received $18,000 in addition on May 10, 1886; it

had nothing to pay until a half year's interest, $4,500, became due on May 15, 1886.

> *Bill sustained with costs.   Decree*
> *according to the opinion.*

WALTON, DANFORTH, VIRGIN, LIBBEY and FOSTER, JJ., concurred.