SOLOMON S. KOPPEL, Plaintiff, *v.* MIDDLE STATES PETROLEUM CORPORATION, Defendant.

ELSE DE GRAAFF, Plaintiff, *v.* MIDDLE STATES PETROLEUM CORPORATION, Defendant.

Supreme Court, Special Term, New York County, February 27, 1950.

*Milton Paulson* for plaintiffs.

*Edwin B. Wolchok,* special attorney for defendant with conflicting interests.

BREITEL, J. These are representative actions, consolidated for purposes of trial, to compel defendant corporation to pay certain dividends for the years 1942 and 1943 claimed to be mandatory by reason of its certificate of incorporation.

Defendant is a Delaware corporation engaged in the oil producing industry. During the period to which these actions relate defendant corporation had outstanding two classes of stock, Class A and Class B. The Class A stock was held by trustees under a voting trust agreement. Plaintiff Koppel has from time to time since February, 1944, held from 5 to 200 of certificates in such voting trust. Plaintiff de Graaff was the owner of 500 such certificates from March 29, 1943, to November, 1948. In the latter month plaintiff de Graaff converted the Class A certificates for voting trust certificates representing 2,000 shares of Class B stock of the corporation.

Plaintiffs sue on their own behalf and on behalf of all other certificate owners similarly situated to recover alleged mandatory dividends for the years 1942 and 1943, payable on shares of Class A stock of the corporation. Plaintiff de Graaff no longer holds certificates representing Class A shares nor did she at the time of the bringing of her action. She owned such certificates during the period for which dividends would have been normally declared for the years 1942 and 1943. Plaintiff Koppel now owns such certificates but did not own them during all of the period in which in normal course the dividends would have been declared for the years 1942 and 1943.

The certificate of incorporation provided for the declaration and payment of noncumulative dividends to the holders of Class A stock in each year out of the ''consolidated net earnings '' as defined, to the extent of two thirds of such earnings, but not in excess of $1.20 per share for any year. In computing expenses, the corporation was entitled to set up '' reserves therefor ''. All the computations were required to be '' as determined in accordance with the accounting practice most generally followed at the time in the oil industry ''.

During the years 1942 and 1943 the corporation concededly had sufficient net earnings, exclusive of reserves set up for future contingencies, to pay additional dividends within the maximum specified by the certificate of incorporation as payable to the holders of Class A shares. Because the directors set up such reserves, the net earnings available for dividends for the Class A stock were lessened by approximately 40¢ a share for the year 1942 and by approximately 48¢ a share for

the year 1943. The corporation paid Class A shareholders 51¢ and 72¢ a share for the respective years.

It has not been controverted in the case that given the net earnings, the declaration and payment of noncumulative dividends to Class A shareholders was "mandated" by the certificate of incorporation. No issue was tendered as to bad faith or malfeasance of the officers or directors of the corporation. Plaintiffs do contend that the setting up of the contingency reserves was improper, a violation of the contract embraced in the certificate of incorporation, and of accounting practice in charging such reserves to the earnings for the years 1942 and 1943. Defendant contends that the setting up of such reserves was expressly permitted by the certificate of incorporation, was good accounting practice, and was within the discretion of the directors in management of the corporation.

Assuming that dividends were undeclared and wrongfully withheld, a present holder of voting trust certificates under a trust of Class A shares would be entitled to sue here. The authority relied on by defendant, *Salt Dome Oil Corp.* v. *Schenck* (41 A. 2d 583, 586 [Del.]), does not hold otherwise, although the beneficial owner of stock in that case was held without standing to object under the provisions of a statute. The court expressly limited its holding to the statutory proceeding. The court commented "nor does the question relate to the status of an equitable owner of the stock, in a court of equity, in pursuit of an equitable remedy". (See, also, 5 Fletcher's Cyclopedia Corporations [Perm. ed.], § 2092.) The present action is, of course, in equity.

However, a right of action to recover such wrongfully withheld undeclared dividends passes as an incident with the transfer of the certificates. (*Boardman* v. *Lake Shore & Mich. So. Ry. Co.*, 84 N. Y. 157, 177 *et seq.*; *Jermain* v. *Lake Shore & Mich. So. Ry. Co.*, 91 N. Y. 483, 492 *et seq.*) The conversion of plaintiff de Graaff's certificates from Class A to Class B in November, 1948, was a transfer that carried with it as an incident any claims for undeclared dividends. *Roberts* v. *Roberts-Wicks Co.* (184 N. Y. 257) is distinguishable as involving a reduction of capital stock and the reducing, involuntarily, of the number of shares held by the plaintiff shareholder which, it was held, did not eliminate a claim for cumulative preferred dividends on the whole number of old shares. The case, therefore, involved a survival of a claim for dividends by the same holder of substitute shares accomplishing the reduction. It did not involve a transfer of shares in exchange for shares of

another class upon voluntary conversion. Consequently, this conclusion alone requires the dismissal of the de Graaff complaint, the plaintiff de Graaff having surrendered her voting trust certificates for Class A shares as far back as November, 1948.

We now turn to the chief issue in the case, namely, the setting up of the contingency reserves and the charging of such reserves to the earnings for the years 1942 and 1943. Involved is the question of the scope of the term " reserves " as used in the certificate of incorporation, and that certificate makes it clear such question shall be determined " in accordance with the accounting practice most generally followed at the time in the oil industry ".

It is agreed that the defendant could have set up and charged to annual earnings reserves to meet future obligations based upon actual losses incurred in the income year but undetermined in amount or extent. Plaintiffs question the right of the defendant, as against Class A shareholders, by virtue of the terms of the certificate of incorporation, to set up reserves out of annual earnings to meet future losses by reason of hazards and events then anticipated but which have not yet occurred. Such reserves, referred to in the trial and herein as contingency reserves, were set up out of earnings (as contrasted with being appropriated out of surplus), in anticipation of war hazards to the defendant's oil wells, and changes in Federal tax policy then being discussed.

Eliminating points of controversy over the accounting issues and giving plaintiff's version the most favorable interpretation, it was clearly established that a significant number of oil companies, and particularly some of the larger ones, set up reserves for future contingencies and charged such reserves against annual earnings. Defendant points out quite correctly that the fact a corporation set up no contingency reserve does not prove that if it had set up one it would not have charged such reserves against earnings as a matter of good or " general " accounting practice. It was also established, but that is not sufficient to limit the directors in their discretion in setting up such reserves in 1942 and 1943, that many accountants and other experts in the field were frowning, during the war years, upon the practice of setting up such reserves out of earnings rather than out of surplus. The controversy at the theoretical level, however, is additional proof that the practice of setting up such reserves out of earnings was sufficiently widespread

and recognized and was, therefore, in accordance with the accounting practice most generally followed at the time in the oil industry.

It is true that such a practice could be abused by directors seeking to obviate the payment of noncumulative mandatory dividends out of net earnings. On the other hand plaintiffs claim no bad faith, and it was shown that some of the directors in defendant corporation were owners of substantial holdings of voting trust certificates in Class A stock. It is likewise immaterial that defendant corporation had no surplus out of which to set up such reserves, if the certificate of incorporation had clearly prevented such reserves from being charged to earnings.

The fact is clear that in the years 1942 and 1943, as shown by the proof in this case, there was no crystallization of practice with regard to contingency reserves. Depending upon internal corporate policy, or the state of their dividend policies, corporations utilized one method or another of charging contingency reserves. Income statements received in evidence, and certified to by leading accountancy firms in the nation, contained such reserves charged to earnings. It cannot therefore be claimed that the defendant acted improperly. That the better practice was eventually determined to be the contrary of what the corporation did in this case does not affect what we must find was the general practice in the war years, namely, to use one alternative or the other.

Accordingly, I find that the reserves for future contingencies established by the defendant corporation in the years 1942 and 1943, based as they were on a variety of uncertainties facing the corporation in the war years, was within the discretion of the directors in the management of the corporation, was not forbidden by the certificate of incorporation, generally or as affecting Class A shareholders, and was permissible or authorized in accordance with the accounting practice most generally followed at the time in the oil industry.

The motions to dismiss the complaint are granted. Defendant's motion for judgment is granted.

Submit findings of fact and conclusions of law within ten days on three days' notice.