**GUTTMANN v. ILLINOIS CENT. R. CO.**
Civ. No. 9195.

United States District Court
E. D. New York.

May 26, 1950.

Nemerov & Shapiro and Norman S. Nemser, New York City (Mortimer A. Shapiro, Aaron Schwartz, Herman I. Lurie, and Stanley Nemser, all of New York City, of counsel), for plaintiff.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (John W. Davis, Theodore Kiendl, S. Hazard Gillespie, Jr., and Francis W. Phillips, all of New York City of counsel), for defendant.

GALSTON, District Judge.

The jurisdiction of the court is based on diversity of citizenship, the plaintiff being a resident of this district and the defendant a resident of the State of Illinois.

The plaintiff is the owner of two hundred shares of 6% noncumulative convertible Series A preferred stock of the par value of $100 each, and on behalf of himself and all other holders of the like issue of stock seeks judgment against the defendant:

(1) Decreeing that dividends on said issue for each of the years 1937 to 1947, inclusive, were fully earned; that there were sufficient earnings or surplus in each of said years to pay the dividends, and that accordingly such dividends are due and payable to the holders of said stock.

(2) Decreeing that the dividend arrears for the eleven years amounted to $66 per share, making a total of $12,306,162.

(3) That while such dividend arrears and any current dividends, or any future dividends as they accrue remain unpaid, no dividend may be declared or paid on the common stock of the defendant.

The Illinois Central Railroad Company was incorporated under the laws of the State of Illinois in the year 1851. It owns and operates a railroad with its principal terminus in the City of Chicago, and serves some of the most important industrial areas

of the United States. It has investments in properties of many subsidiaries, together forming what is known as the Illinois Central System. This system operates more than 6,000 miles of railroad.

As at December 31, 1947, the funded debt of the defendant, including equipment obligations, first and other mortgages on properties, collateral trust obligations, debenture obligations, was the sum of $229,595,970.

The common stock, as at that date, par value $100, issued and outstanding, totaled 1,357,994 shares.

The preferred stock, 6% $100 par value, noncumulative convertible, issued and outstanding as at the same date, totaled 186,-457 shares.

The issue of the preferred stock was pursuant to resolutions of the annual meeting of the stockholders held April 19, 1922, and the meetings of the board of directors held April 27, 1922, October 10, 1923 and September 29, 1925.

The stock certificate of the 6% noncumulative convertible preferred stock, Series A, contains the following provisions: "The preferred stock shall be preferred both as to dividends and assets and shall be entitled to receive out of the surplus or net profits of the Company, in each fiscal year, dividends at such rate or rates, not exceeding seven per cent. per annum, as shall be determined by the Board of Directors in connection with the issue of the respective series of said stock and expressed in the stock certificates therefor, before any dividends shall be paid upon the common stock, but such dividends shall be non-cumulative. No dividends shall be paid, declared, or set apart for payment on the common stock of the Company, in any fiscal year, unless the full dividend on the preferred stock for such year shall have been paid or provided for. Whenever in any year the dividend paid on such preferred stock is less in amount than the full dividend payable on all such stock outstanding, the dividends paid shall be divided between the series of such stock outstanding in the same proportion to the aggregate sums which would be distributable to the preferred stock of each of such series if full dividends were paid thereon."

Dividends for the years 1922 to 1931, inclusive, were paid on said preferred stock at the rate of 6%. However, commencing in 1932 no dividends were declared or paid on the preferred stock until 1948, at which time payment of a 6% dividend on the preferred stock was declared, 3% of which was paid on May 15, 1948, and 3% on September 1, 1948. In 1949 the full 6% dividend was also declared and paid. So far as dividends on the common stock are concerned, payment was suspended on October 27, 1931. No dividend on such stock was thereafter declared until January 18, 1950, when after providing for payment of the dividend on the noncumulative preferred stock for 1950, the board of directors declared a dividend of $1.50 on the common stock payable July 1, 1950.

It is agreed that the amount of money which would have been needed to pay 6% dividends on the outstanding 186,457 shares of the noncumulative convertible preferred stock, Series A, for the period from January 1, 1937 to December 31, 1947 is the sum of $12,306,162, which is the aggregate of $1,118,742 per annum for those years.

It is the contention of the plaintiff that since the net income each year from 1937 to 1947, inclusive, exceeded the annual dividend requirement on the noncumulative preferred stock, such dividend should have been declared and paid for each of said years. The plaintiff argues that under the terms governing the issue of dividends on such stock, the directors had no discretion with respect to the declaration of such dividends, and during the years in question the payment of such dividends was mandatory. The plaintiff also contends that even assuming that the directors had discretion, they abused their discretion by failing to declare and pay such dividends. Thirdly the contention is made that assuming the right to a preferred dividend was not mandatory, and that the directors did not then abuse their discretion in failing to declare and pay preferred dividends, nevertheless such dividends for the years 1941 through 1947 were merely deferred, and must now be paid or provided for before

any dividends may be paid on the common stock.

The defendant's position is that whether dividends on the 6% noncumulative convertible preferred stock, Series A, should be declared and paid in any year rests wholly in the sound business judgment and discretion of its board of directors.

Moreover, though admitting that the consolidated net income of the defendant in each of the years 1937 to 1947, inclusive, exceeded $1,118,742, such income in each year was either expended consistently with defendant's lawful duties to its stockholders and to the public to promote safe and efficient maintenance of its property and service, or, in the judgment of its board, was required for corporate purposes other than the payment of such dividends.

Similarly in respect to plaintiff's allegations respecting the total surplus of the defendant as reported in its annual reports to stockholders, the defendant contends that such surpluses represented in major part investments made in previous years in defendant's business and physical properties which could not be declared or paid out as dividends; and also that any cash or temporary cash investments in those items were in the sound business judgment of its directors required for defendant's corporate purposes other than the payment of dividends.

The defendant also alleges that though cash and temporary cash investments at December 31, 1947, as set forth in its 98th annual report, were $71,502,494.79, in the judgment of its board of directors that sum was required at that time to meet early maturing funded debt obligations amounting to $229,595,970, issued and assumed by the defendant, and for maintenance of its property and service and working capital.

Among the affirmative defenses set up is that relating to the solution of the railroad's problems attending its heavy early maturing funded debt, which at December 31, 1937 amounted to $367,588,175. Notes to the Reconstruction Finance Corporation amounting to $35,185,000, maturing in 1939 were extended to 1944. When application was made in 1942 for an order for exten-

sion of said notes, the defendant was obliged, in order to procure such extension, to meet various conditions imposed by the Reconstruction Finance Corporation. Among them was the requirement that the loan be reduced on or before January 1, 1943 by $10,000,000; that the extended note be secured by collateral having a market value of not less than 135% of the aggregate principal of the notes; and that the railroad company provide an annual sinking fund, payment in cash or its equivalent in bonds, of not less than 1% of the principal of said note. Finally, as very intimately related to the issues in this case, the railroad company was required to agree that as long as it remained indebted to the Reconstruction Finance Corporation it would never declare nor pay any dividends on any class of its capital stock unless written consent of the corporation was first obtained. Recommendation was also made by the Reconstruction Finance Corporation that the railroad reduce its fixed charges; and with that understanding the Corporation agreed that from time to time, with the prior approval of the Interstate Commerce Commission, it would lend the railroad money to assist the railroad company in purchasing its bonds at a discount. It developed that during the year 1943, because of the increase in the defendant's revenues, due to wartime conditions, the defendant was able to make payment of its notes to the Reconstruction Finance Corporation, and thus comply with a request made in 1942 by Jesse Jones, the head of the Reconstruction Finance Corporation.

Then in the fall of 1945 the board of directors of the railroad company undertook additional steps to solve the problem entailed by the existing heavy funded debt, and authorized the issuance, on November 1, 1945, of an invitation for tenders on $53,794,000, face amount of the defendant's non-callable bonds due in the years 1950, 1951 and 1952. Pursuant to this invitation bonds were tendered in the amount of approximately $32,000,000 face amount, but at such prices that the defendant could accept only $15,464,000 face amount, which were purchased at an average of 95%, or at a cost of $14,757,536.75.

In December 1945 the directors formulated a plan to issue two classes of new bonds, Series A, to the extent of $49,443,000, and Series B, to the extent of $35,000,000 by which the A bonds were to be offered in exchange for outstanding non-callable bonds in a similar face amount. The Series B bonds were to be sold to the public, and the proceeds used to redeem refunding bonds outstanding in the amount of $35,000,000. On January 16, the stockholders authorized the creation of a new mortgage for the purpose of securing the proposed new bonds. However, less than 50% of the principal amount of the exchangeable bonds were deposited despite the fact that there was an increase in the interest rate of bonds from $3\frac{1}{8}\%$ to $3\frac{1}{4}\%$. Consequently on June 21, 1946 the defendant was obliged to abandon that plan.

Among other problems facing the directors was the claim by the State of Illinois, involving a potential liability for charter taxes of from $30,000,000 to $50,000,000. In December 1946, in settlement in part, the defendant paid $5,955,175 to the State of Illinois, and finally, on May 20, 1948, an additional sum of $171,848.66.

The plaintiff waived, during the course of the trial, such allegations of the complaint as purported to charge the defendant with having been dominated in its corporate acts by the Union Pacific Railroad Company as the holder and owner of 28.94% (98,270 shares of the preferred stock and 268,700 shares of the common stock) of the outstanding stock of the Illinois Central, and that Wayne A. Johnston was elected at the instance of the Union Pacific Railroad Company.

The plaintiff's proofs consisted solely of exhibits based on the company's annual reports as interpreted by the witness Holtz. The plaintiff then rested.

The defendant called as its witnesses a group which, in the order in which they appeared on the stand, included the Chairman of its Board of Directors, Eugene Stetson; the Vice President in Charge of Accounting, Robert E. Connolly; a Vice President and General Counsel, Vernon W. Foster; directors King and Gaylord; George W. Bovenizer, an investment banker; Charles A. Mottier, Vice President and Chief Engineer, and Wayne A. Johnston, its President.

Testimony, together with the defendant's main exhibits, was directed to the basic issue of discretion and sound judgment exercised by the board of directors of the road at all times.[1] During the period from 1931 to 1936, which was generally regarded in the financial and industrial world, and indeed by people of the United States generally, as a depression period, the railroad was operated at a loss of roughly $3,500,000 in 1931 and 1932, earned $158,906 in 1933, showed losses of approximately $3,000,000 in 1934, and of $9,800,000 in 1935, and a profit of $864,603 in 1936. These operations contrasted sharply with the operation of the road from the period from 1921 to 1930, inclusive, during which period the net income averaged $14,000,000 annually.

The record discloses, in addition to the falling off of revenue, that in 1937, and continuing thereafter, the railroad faced serious problems which required mature, sound and expert judgment on the part of the management. From 1937 on the net income of the railroad exceeded, as a matter of cold, statistical comparison, the amount which would have been required to meet a 6% dividend on its outstanding preferred stock. But there were many considerations which faced the directors and made such a step inadvisable. As has been shown, in 1937 and continuing thereafter, early maturities of funded debt gave grave concern. At that time the total debt, issued and assumed by the company, was $367,588,175, with interest charges of $15,536,090.21, for that year. In 1932 the interest charges in the light of the company's earnings had required the company to obtain assistance from the Reconstruction Finance Corporation. The Chairman of

1. Other defenses such as that of estoppel and the statute of limitations were, in the summation of counsel following the conclusion of the trial, waived by the defendant.

the 'Board, Mr. Stetson, testified that in 1932 the condition of the road was so grave that it faced a crisis. The board found it necessary drastically to reduce maintenance of both equipment and road. In 1937 he said that it looked as though the road would be unable to escape receivership. As part of the plan to avoid reorganization, 4,000 employees were dismissed, and additional aid from the Reconstruction Finance Corporation in the sum of $10,000,000 was required because of the maturity of $12,500,-000 in securities. During this time the board was vitally concerned with saving the railroad for the future benefit of the bondholders, of both classes of stockholders, as well as for the benefit of the public. Fortunately the net income of the road substantially increased in 1941, 1942 and 1943; but in 1944 the income was $8,000,000 less than it had been in 1943. From a high of $25,129,122 in 1943, it fell to seven million odd dollars in 1946, picking up again to $15,000,000 in 1947, and $20,000,000 in 1948.

Mr. Stetson was of opinion that during the war period "the Illinois Central should take all steps to map out a program to have an objective to profit as best it could by reason of the circumstances of increased traffic, both freight and passenger, with the idea of using that money to finally save this railroad and bring it back to a first-class railroad". During those years, owing in part to scarcity of many necessary materials, make-shift work was resorted to to keep up the roadbed; and much equipment which was required the defendant was unable to purchase.

Even though the net income of the road increased, for example to $10,557,000 in 1941, and to $24,914,000 in 1942, and then in 1943, to $25,129,000, the directors did not declare a dividend. It was during this period that at a meeting of the executive committee, held November 20, 1942, the president of the road read letters from attorneys in Toledo and Chicago in which demand was made for the payment during that calendar year of a dividend on the noncumulative preferred stock. The request was denied by resolution, which recited the necessity of meeting unprecedented expenditures and maturities during the years 1943 and 1944. It is significant that no action was begun on behalf of these stockholders who made the inquiry or demand, or indeed by any stockholder either then or prior to the year 1942 or thereafter until the complaint in this case was filed on July 6, 1948.

To revert to the bond purchasing program, it was explained that by virtue of the very complicated bonded structure of the railroad wherein it appeared that there were issues of non-callable bonds with different maturities and of different issues,[2] it was desirable to have one mortgage or two in substitution thereof. The fiscal policy indicated also the necessity for purchasing the leased lines certificates aggregating $10,000,000. Mr. Stetson was asked, in cross-examination:

"Q. Do you think it is fair to the preferred stockholders whose return is strictly limited and who do not share in any future benefits which might be derived by common stockholders from the realization of this ideal situation to deprive them of their dividend in those years when you are building up to this ideal situation? A. Most of them bought their stock down in the 30s or 40s and the stock today is selling in the 90s, and they have gotten the benefit of an appreciation by reason of the policies which the management, in my humble opinion, have put in force and I think to now try to pay them $12,000,000 out of the treasury of this company is just something that should be unheard of and unthinkable."

The accounting officer, Connolly, who in 1942 and thereafter was also a member of the board of directors, adding to the testimony of Mr. Stetson, referred to certain recommendations from the Interstate Commerce Commission, dated December 3, 1942. This memorandum strengthened his view that dividends should not be paid. The opinion of the Interstate Commerce Commission recites: "Moreover, so far as most

2. Mr. Bovenizer testified that there were twenty-three mortgages on the northern lines and five on the southern lines of the system.

of the railroads which are not in bankruptcy are concerned, it seems clear that it would be a mistake, in the present tide of apparently revived earning power, to ignore the fact that they have a very heavy burden of debt and that it may be a crippling burden in the future, if earnings should radically decline. We have noted with approval that many of the managements are avoiding this mistake and are using the favorable earnings of the present, in one way or another, to reduce fixed charges as rapidly as practicable. While stockholders may on first thought be disposed to object to such a policy, it is the stockholders who will suffer most in the event of future insolvency. They will, we believe, be shortsighted if, by insistence on immediate dividends, they jeopardize the continuance and possible expension of a program of debt reduction. It is clearly the sane and sound policy to pursue."

Connolly explained too that during the war period the purchase of rail, of cars and even maintenance ties had to be deferred. He said: "I didn't think that we should dissipate our cash when we were building up a lot of deferred maintenance that had to be made good some time."

The General Counsel of the railroad company, Mr. Foster, who was also a director, was also of the opinion that no dividends should have been declared in the years in question. He added the thought that "the biggest factor was that we get our house in order * * * so that once we started paying dividends we could with all reasonable hope, continue to pay dividends". He too emphasized that because of the condition of the equipment and of the road, even though they thought both were safe, nevertheless there were immense amounts of deferred maintenance required for both road and equipment. Added to that he stressed the various contingencies hanging over their heads, such as the maturities of 1950 to 1955. He said: "They were considerable in those days and at the time nobody saw the light as to just what could be done with them. We hadn't gotten to the point where anybody knew, even at that time, how we were going to be able to get out of the woods." With some detail Foster also described the long drawn out charter tax case brought by the State of Illinois.

In addition to other financial problems, the board of directors had to consider the matter of its claimed reduction of income tax assessment arising out of its ownership of stock in the Central of Georgia Railroad Company. This situation required a substantial cash reserve for the years 1945, 1946 and 1947. The matter has not yet been settled with the Internal Revenue Department.

Directors King and Gaylord confirmed the views of their fellow directors. Mr. Gaylord emphasized that even in 1941, when there was a net income of $10,000,000, he did not believe that a dividend should be paid on the preferred stock, for "We knew that we had to correct the bond structure; we knew we had to correct the maintenance and get new money for betterments. In other words, we had to operate the railroad successfully if we were to do the trick of restoring it to good health."

He was asked an interesting question in cross-examination which rather crystalized the frequently posed question of hindsight versus foresight:

"Q. And if they (present figures and balance sheets of the defendant) indicate the Illinois Central could have paid dividends in each of the years 1941 through 1947, wouldn't that lead to an inference that the directors were wrong in not having paid them in those years? A. That is not the inference that I draw. I draw the inference that wisdom of the way Illinois Central was handled as to policy was successful."

The president of the road, Wayne A. Johnston, covering matters that had been discussed by Mr. Stetson and other witnesses, emphasized the importance of the charter tax case, the necessary improvement of the Cairo bridge, and obtaining a sufficient amount of equipment to take care of the traffic and "in general the expenses that we foresaw that had to be taken care of in order to have a good going railroad."

Charles A. Mottier, a vice president and chief engineer of the railroad company, testified that he knew of the program that was

being followed by the railroad in 1935 and later to stay out of receivership. He made a complete study of every branch line and knew its physical condition which he said was "terrible". He emphasized the net income account as revealed in Exhibit Q-5. During the first ten year period from 1921 to 1930, the average net income was something over $14,000,000. During the next ten years, from 1930 to 1940, the average showed a deficit of $1,187,000. He said: "So our people did what would be expected under the circumstances and curtailed expenditures, which was reflected not only in the maintenance charges, but also in additions and betterments," by which he meant capital expenditures. Likewise he called attention to the operating expenses chargeable to the road in the first period, which had averaged something more than $24,-000,000 a year; in the second period only an average of $10,000,000 a year was expended. Under gross capital expenditures, it appears that the average in the period from 1920 to 1930 was $16,300,000, whereas in the succeeding decade ending 1940, the average was cut down to $1,600,000. As a matter of proper accounting he contended that railroad property could not be considered without including both the capital charges and the maintenance charges, stating "they go together. For example, you put in rail and part of that charge goes to capital, part to maintenance." Rather picturesquely, but not without convincing emphasis, he added: "As a result of this starvation diet, the railroad had to be maintained and maintained safely, and our people did the only thing they could do. This starvation diet was applied to our main line tracks, and very, very sparingly. Our rail was practically— that we bought, new rail—was practically negligible, and whenever we bought anything we bought the very cheapest."

The problem of expenditure of funds wisely within the period (1930-1940), and the deferred maintenance were closely related. No improvement of yards was undertaken; indeed certain of the yards were abandoned, and the road used only enough tracks to handle the business. That was the policy all over the road. They were compelled to take the material from unused tracks and put it in the other tracks. In the purchase of ties they bought the cheapest and did the most they could therewith. Mottier said, as to buildings, no improvements were effected; roofs leaked, and the sheathing became rotted. They stopped painting their bridges. All in all, the physical picture of the road as described by the chief engineer justified his conclusion that the condition was "terrible".

Then as the operating revenues increased, as is reflected in Exhibit Q-5, immediately prior to the war and while we were in the war, they commenced to get rail in from 1941 to 1944, and it became imperative to do everything they could as quickly as possible to get their plant in shape to take care of the increased traffic. Thus they built new yards, enlarged others and lengthened their passing tracks. They were hampered, as were all roads, with the shortage of steel, but got such priorities as were allowed by the War Production Board and the Office of Defense Transportation. However, during this rehabilitation it was necessary for the defendant to abandon some branch lines to get rail. A study of the entire railroad was necessitated to see what branches could be shortened, and if pipes could be substituted for trestles, so as to reclaim the bridge material. He added: "I don't know how we would have been able to make the grade if we hadn't done that." However, even with the improvements effected as of January 1, 1950, as a matter of accounting the road was in the neighborhood of $22,000,000 still indebted to deferred maintenance. The schedule that Mottier submitted discloses the amount for maintenance that should have been undertaken under "a normal operation prior to January 1, 1950, had we had sufficient funds available".[3] The report of the engineer's department, dated October 13, 1945,[4] indicates that a capital expenditure in respect to the reconstruction of the Cairo bridge would be in the neighborhood of $7,000,000. That was regarded as a heavy

3. See Exhibit V-9.

4. See Exhibit X-9.

item of expenditure. After negotiations and conference with the Army Engineers of the War Department, it was determined that the sub-structures could remain and that it would be necessary to put up only a new super-structure on the existing piers. The contract was awarded for the sum of $6,300,000. Originally the probable cost loomed much higher, for it was contemplated to rebuild the sub-structures also. The board at that time was confronted with an expenditure of from $10,000,000 to $15,000,000.

During the war, seventy munitions and other plants, including military camps, were located adjacent to the railroad company's lines, resulting in heavy requirements in respect to transportation of troops and materials. It developed that the New Orleans terminal was called upon to handle a very considerable percentage of the business arising in and out of that port. This was true also in other areas served by the defendant.

Expenditures, therefore, during the war years faced the railroad in respect to the building of new terminals in both New Orleans and in Chicago.

Thus the sound business judgment of the board involved many considerations. There was first of all the depression period from 1931 to 1937 in which the position of the road became critical. There were then to be considered maturing debt obligations, the necessity of borrowing from the Reconstruction Finance Corporation, and on terms which barred the railroad company, as has been heretofore stated, from declaring any dividends except with the consent of the Reconstruction Finance Corporation. What made the earnings possible thereafter was the increased traffic brought on by the conditions of World War II. Their fiscal policy seems neither unreasonable nor arbitrary. The directors were all men of affairs, experienced in business, railroading and finance. They sought and obtained the advice of an independent expert in the field of railroad financing, George W. Bovenizer, a partner of Kuhn, Loeb & Co. He said that the financial condition of the Illinois Central in 1937 was "pretty bad"; that the debt was too high and the fixed charges were much too high, and as against the cold figures that are shown to evidence earnings, he said of 1937: "In that year they only earned their charges by 1⅛ times of their interest charges, and therefore the situation worried me."

In addition to consultation with Mr. Bovenizer, the board sought and obtained the advice of officials of various banks, which included the Guaranty Trust Company; the Chicago Continental Illinois National Bank & Trust Company; Jesse Jones, Secretary of Commerce and the head of the Reconstruction Finance Corporation; Frank Wright, representative in New York City of the Reconstruction Finance Corporation, and Commissioner Charles D. Mahaffie of the Interstate Commerce Commission.

On the basis of the foregoing presentation of contentions and proof, it appears that the pivotal question in the case is the sound business judgment of the board of directors in withholding declaration of dividend on the noncumulative preferred stock despite the existence of net income in each of the years from 1937 to 1947, inclusive, in excess of the amount which would have been required to pay such dividends in each of the years in question. I say this is the pivotal question because, as will appear further along in this opinion, I cannot accept the contention made by the plaintiffs that because of the existence of such excess or surplus during the years in question, the directors were not clothed with any discretion with respect to the declaration of such dividends.

█ It is agreed that the law applicable in the determination of the dividend rights is the law of Illinois, since jurisdiction in this case is based on diversity of citizenship, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

The defendant cites Hofeller v. General Candy Corp., 275 Ill.App. 89. In that case the plaintiff, a stockholder, held Class A common stock, which had dividend preference over Class B common stock. The stockholders had recommended the payment of a dividend, and there appeared to be ample surplus and earnings available. The defendant refused to declare and pay the

dividend. It was in effect held that in the absence of fraud or arbitrary action, the determination in respect to dividend declaration was a matter for the board of directors. The court said: "The question of a dividend * * * is one which rests wholly in the business judgment of the board of directors, and a court of chancery should not substitute its judgment for that of men actively engaged in business in the community, Hall v. Woods, 325 Ill. 114, 156 N.E. 258."

The opinion points out that even when the by-laws provided for a fixed dividend per annum on a certain class of stock, there may come a time when it would be fatal to the best interests of all the stockholders to part with ready cash, citing Gibbons v. Mahon, 136 U.S. 549, 10 S.Ct. 1057, 34 L.Ed. 525. Other Illinois cases in accord with this principle are Owatonna Metal Products Co. v. H. D. Hudson Mfg. Co., 283 Ill.App. 199; Gehrt v. Collins Plow Co., 156 Ill.App. 98, and Robertson v. H. E. Bucklen & Co., 107 Ill.App. 369.

One of the most persuasive cases cited by the defendant, though not an Illinois case, is Hastings v. International Paper Co., 1919, 187 App.Div. 404, 175 N.Y.S. 815, 819. The plaintiff, the holder of cumulative preferred stock of the defendant company, in his own behalf and in behalf of others similarly situated, sought to compel the company, through its board of directors, to declare deferred dividends which had accumulated on the preferred stock held by the plaintiff and others. Without reciting the facts in full, it may suffice to say that the books of the company showed surplus in each of the years involved, so that the company at the time of the action had sufficient funds and assets to pay the deferred cumulated dividends. Just as in the instant case it was urged that the plaintiff, as a matter of right, was entitled, under the express terms of his certificate of preferred stock, to the immediate payment of these dividends; but the court determined otherwise. It emphasized the well known rule of law that stockholders are not creditors of a corporation, but are simply the owners of certain shares or interests therein; that they are entitled to distribution of corporate property only at such times as corporate funds are made available for distribution by proper action on the part of the board of directors. The opinion pointed out what is self evident, that the only way to control a corporation is through the board of directors duly elected by the stockholders, and it is they alone who may say "when, how, and to what extent dividends are to be paid. The purchasers of preferred stock are supposed to purchase and hold the same with full knowledge of the general powers of the board of directors, and with full knowledge of the discretionary powers vested in such board, not only to declare dividends * * *." The action was tried in October 1918, and the court makes this interesting observation: "While perhaps in ordinary times the case is one which might justify the court in directing a distribution of the dividend asked by the plaintiff, as the above decisions show, the courts act in these cases with great reluctance, and only interfere with the discretionary powers of directors of corporations when it is apparent that such powers have been abused or that there has been bad faith."

The opinion refers to the Nickals case, infra, as the leading authority on the question under consideration.

The plaintiff, on the question of a standard of discretion, relies on Cratty v. Peoria Law Library Association, 219 Ill. 516, 76 N.E. 707.

As to the last named case it may be observed that it was not that involving a preferred stockholder's claim. On the contrary, it was made pursuant to the by-laws of a library association which read as follows:

" 'Sec. 12. The association guaranties to every stockholder a dividend of eight per cent. per annum on the amount of paid-in stock held by him or them from the date of such payment, which dividend shall be a charge against the association, and the production of the certificate of stock or receipt of payment shall entitle the holder to the amount of such dividend. Such dividend shall be due and payable on the first day of January in each year.'

" 'Sec. 15. The board of directors shall fix the annual dues of members at such an amount as may be necessary to raise a sufficient sum, annually, to pay: First, a dividend of eight per cent. per annum on the paid-in capital stock of the association; second, the necessary expenses of the association; third, to keep up the continuation of all the reports and legal periodicals owned by the association; and, fourth, to purchase new books and legal publications. * * *' "

■ The court held that in consequence of these by-laws a contract resulted between the corporation and the shareholders who took their shares in reliance thereon. Moreover, in Tennant v. Epstein, 356 Ill. 26, 189 N.E. 864, 870, 98 A.L.R. 1515, reference was made to Cratty v. Peoria Law Library Association in the following terms: "In Cratty v. Peoria Law Library Ass'n, 219 Ill. 516, 76 N.E. 707, we recognized the rule that, while the directors of a corporation are given a wide discretion as to the question of declaring dividends, yet, if this discretion is abused, or if they act in bad faith or in an arbitrary manner, a holder of common stock may ask the aid of equity to compel the declaration of a dividend."

It follows that unless an abuse of discretion is proved, or proof of action in bad faith or in an arbitrary manner is established, according to the law of Illinois there resides in the board of directors the right of discretion.

It is true that in the Cratty case the court said that "generally, the question of declaring a dividend is entrusted to the sound discretion of the directors; and, as to common stock, such discretion will not be interfered with by a court of equity in the absence of bad faith or arbitrary or unjustifiable conduct. But different rules apply with respect to the right of holders of preferred stock to invoke the aid of a court to order the declaration and payment of dividends on their stock."

However, it must be emphasized that in Cratty v. Law Library Association, supra, the case did not involve the rights of the holder of preferred stock. There is no Illinois law recited by the plaintiff which sustains his contention that the board of directors in the circumstances involved in the case at bar was barred from exercising its sound discretion.

Moreover, federal law on the subject is against the contention of the plaintiff. The two leading cases are Wabash Railway Co. v. Barclay, 280 U.S. 197, 50 S.Ct. 106, 74 L. Ed. 368, 67 A.L.R. 762; and New York, Lake Erie & Western Railway Co. v. Nickals, 119 U.S. 296, 7 S.Ct. 209, 30 L.Ed. 363.

In the Wabash case, suit was brought by the owners of a first preferred stock, Class A, of the Wabash Railway Company, to have it declared that holders of such stock were entitled to receive preferential dividends up to 5% for each fiscal year from 1915 to 1926, inclusive, and that the company be enjoined from paying dividends upon preferred stock B, or common stock, unless it shall first have paid such preferential dividends of 5%. It appeared that from 1915 to 1926 there were net earnings in most of the years, but for a number of years no dividend, or less than 5% was paid on Class A, while $16,000,000 net earnings that could have been used for the payment were expended upon improvements and additions to the property and equipment of the road. The Supreme Court, with Mr. Justice Holmes writing, quoted the obligations assumed by the company in its instruments of incorporation and in the certificates of stock A: "The holders of the Five Per Cent. Profit Sharing Preferred Stock A of the Company shall be entitled to receive preferential dividends in each fiscal year up to the amount of five per cent. before any dividends shall be paid upon any other stock of the Company, but such preferential dividends shall be non-cumulative."

The opinion adds: "We believe that it has been the common understanding of lawyers and business men that in the case of non-cumulative stock entitled only to a dividend if declared out of annual profits, if those profits are justifiably applied by the directors to capital improvements and no dividend is declared within the year, the claim for that year is gone and cannot be asserted at a later date."

Mr. Justice Holmes continues: "When a man buys stock instead of bonds he takes

a greater risk in the business. No one suggests that he has a right to dividends if there are no net earnings. But the investment presupposes that the business is to go on, and therefore even if there are net earnings, the holder of stock, preferred as well as common, is entitled to have a dividend declared only out of such part of them as can be applied to dividends consistently with a wise administration of a going concern."

Wabash v. Barclay, supra, cites New York, Lake Erie & Western Railway Co. v. Nickals, 119 U.S. 296, 7 S.Ct. 209, 213, 30 L.Ed. 363. It had been held in that case by the lower court that the right to a dividend for a given year, payable out of the net profit arising from the operations for that period, was absolutely secured to the preferred stockholders both by the plan and agreement, and by the articles of association. That was held by the lower court to be a contract between the company and the preferred stockholders which the court was not at liberty to disregard. With that view the Supreme Court disagreed, holding that there is nothing in the language therein, in plan or agreement or articles of association, which deprived the directors of the discretion with which managing agents of corporations are usually invested when distributing the earnings of property committed to their hands. The contention in the case had been that the board of directors was required to declare and cause to be paid a dividend on noncumulative preferred stock in every year when it should be officially declared that there were net profits from the operations of that year. Mr. Justice Harlan, writing for the court, said: "* * * we are of opinion that the contention of appellees is not sustained by a reasonable construction of the agreement. That instrument did, indeed, provide for preferred shareholders being paid a dividend of 6 per cent. before any dividend was paid to common shareholders. But it was not intended to confer upon the former an absolute right to a dividend in any particular year, dependent alone on the fact, or the official ascertainment of the fact, that there were profits in that year, after paying operating expenses and fixed charges. * * * What

was stipulated to be paid to them as holders of preferred stock in the new company was not a debt payable in every event out of the general funds of the corporation, but a dividend, 'as declared by the board of directors,' and payable out of such portion of the profits as should be set apart for distribution among shareholders."

Of particular interest because of its relevance to the facts of the case at bar was the testimony of Mr. Jewett, the president of the railroad company. Mr. Justice Harlan said: "The testimony of Mr. Jewett, the president of the company, * * * is that the use of that fund in the way in which it was applied was imperatively demanded by the interests as well of creditors, shareholders, and bondholders as of the public."

Mr. Jewett had testified that in his judgment if improvements had not been made, and most judiciously made, "the company could not have paid its fixed charges. It would have again gone into bankruptcy, and the entire interest of the stockholders been destroyed."

These two cases, Wabash v. Barclay, supra, and New York v. Nickals, supra, seem to establish clearly enough that in respect to cases arising in the federal courts the declaration of dividends by a board of directors was not mandatory and did vest, on the contrary, in the sound business judgment of the board of directors.

Nor is a late New York case cited by the plaintiff, Koppel v. Middle States Petroleum Corporation (De Graaff v. Middle States, Petroleum Corporation), 197 Misc. 479, 96 N.Y.S.2d 38, 43, authority for the contention that the directors are under mandatory requirement to declare dividends. On the contrary, in that case, as in the instant action, there was no claim of bad faith on the part of the directors, and in passing on the system of accounting adopted by the management, the court found that the reserves for future contingencies "based as they were on a variety of uncertainties facing the corporation in the war years, was within the discretion of the directors in the management of the corporation, was not forbidden by the certificate of incorporation, generally or as affecting Class A shareholders, and was permissible or authorized in accordance

with the accounting practice most generally followed at the time in the oil industry."

The plaintiff relies on other state court decisions which, however, fail to establish the point that he seeks to make, that in the circumstances of the instant case the board of directors had abused its discretion. Such cases as Titus v. Piggly-Wiggly Corp., 2 Tenn.App. 184; Patterson v. Durham Hosiery Mills, 214 N.C. 806, 200 S.E. 906; Inscho v. Mid-Continent Development Co., 94 Kan. 370, 146 P. 1014, Ann.Cas. 1917B, 546; and Star Publishing Co. v. Ball, 192 Ind. 158, 134 N.E. 285, are clearly distinguishable. In Titus v. Piggly-Wiggly Corp., supra, in declaring that the preferred stockholders have a contractual right to demand and receive dividends, the court based such conclusion on the specific language in the certificate of stock, making, however, this important restriction: "provided there is no impairment in the capital stock and other legal obligations of the corporation are met."

In Patterson v. Durham, supra, the question involved the rights of holders of cumulative preferred stock, who claimed apparently that accrued dividends for cumulative preferred stock created an obligation on the part of the corporation which should be considered a vested property right. The court said that such rights are " * * * subject to many conditions arising out of the relation of the stockholder to other stockholders, to the corporation itself, and to its creditors, which might interfere with the fruition of the contract." [214 N.C. 806, 200 S.E. 909]

Inscho v. Mid-Continent Development Co., supra, is another case involving the rights of cumulative preferred stock. This case held also that, in contradistinction from the plaintiff's claim herein the duty to pay creditors was superior to the duty to pay preferred stockholders. In Star Publishing Co., supra, the facts are so wholly different it proves of no avail to recite them.

Since there is no Illinois case, nor other authoritative law, to the contrary, the conclusion must be reached that in this case the board of directors was vested with discretion, not merely during the years 1941 to 1947, but also from the years 1937 to 1941.

The only mandatory features which may be conceded, and which indeed doubtless have caused confusion in asserting the plaintiff's claim as one of absolute right, are merely those which recite that the dividends are to be declared out of "surplus or net profits of the company" and that "no dividends shall be paid, declared or set apart for payment on the common stock of the company * * * unless the full dividend on the preferred stock for such year shall have been paid or provided for". At the same time discretion is expressly reserved to the directors in respect to convertible rights and redemption of the preferred stock issued. Neither in express terms nor in terms implicit is the board of directors barred from the exercise of sound business judgment in the determination of the time when such dividends may be declared.

There is one further point made by the plaintiff which should be disposed of. He contends that the board of directors had no legal right to purchase its funded debt prior to maturity to the exclusion of preferred stock dividends. The cases cited by the plaintiff in support of its proposition are Belfast & M. L. R. Co. v. City of Belfast, 77 Me. 445, 1 A. 362, 368, and Hazeltine v. Belfast & M. L. R. Co., 79 Me. 411, 10 A. 328, 1 Am.St.Rep. 330. In the former of these two cases the court distinguished between funded and floating debt. The floating debt is regarded as covering such obligations for temporary purposes as could not be renewed when due. The court placed funded debt on a different basis as "a permanent or standing, interest-bearing indebtedness". It is true that the court did hold that the monies available for the payment of the preferred stock dividend should be employed only to pay the floating debt at maturity. However, while recognizing this distinction between the two classes of debt, it is significant that the court held: " * * * But it does not necessarily follow that debts should be first wholly paid, before a declaration of dividends, merely because they are of a floating character. * * * Nor does it follow that all of the income of a road may not be needed for the payment of its funded or standing debt. All depends upon the

financial resources and abilities of the corporation, and the prospects of its road." 77 Me. 445, 1 A. 362, 366.

In Hazeltine v. Belfast, supra, it having appeared that the floating debt had been paid at maturity, preferred stockholders brought suit to compel payment of dividends for the year 1886. The railroad contended that it had the right to apply its earnings to meet the funded debt maturity to the exclusion of preferred stock dividends. The maturity was only three years away. It would seem that the court's decision in that case was in large measure, if not wholly, determined by the railroad's contention that it was entitled to pay off the entire funded debt before declaration of dividends.

However, the factual conditions in the Belfast case are quite different from those in the instant case. There it appeared that the railroad company was not running the road. It had leased the railroad property for a term of fifty years, the lessee undertaking to maintain track and equipment and keep the same in repair. It was that which led the court to observe: "In many cases there is difficulty in ascertaining what the actual condition of a company may be. None exists here. There could not well be an instance of less complicated affairs. The business of the company is guarantied, its amount of income fixed, its expenses are nominal, and its freedom from all the liabilities and risks usually incident to the management of a railroad is assured, for the next 33 years." [79 Me. 411, 10 A. 333]

Even in the case of Inscho, supra, the court said:

"But as was said in the case of Hazeltine v. Railroad Company, 79 Me. 411, 416, 10 A. 328 (1 Am.St.Rep. 330), cited by the plaintiff:

"The question whether money on hand shall be regarded as net earnings 'depends usually on several considerations—is a relative question—not always susceptible of clear demonstration—and is a matter, to a considerable extent of good judgment in conducting the company's business and of good faith in upholding its contracts on the part of directors.'" [94 Kan. 370, 146 P. 1023]

Finally, I cannot regard Dohme v. Pacific Coast Co., 5 N.J.Super. 477, 68 A.2d 490, as convincing, for the opinion cites New Jersey Supreme Court decisions which are based on the New Jersey statute.

There then remains for determination the question whether discretion was justifiably exercised in the instant case. The matter is not one of simple arithmetic, as the plaintiff would have us believe. The net earnings must be integrated with other dominant considerations. First of all there are matters arising out of the economy of the nation as it survived the depression period; the abnormal industrial activity which had its beginning at the outbreak of World War II, even before we entered the war ourselves; the necessity for planning ahead with a knowledge of increasingly high labor and commodity costs; the uncertainty as to the duration of the war and what its effect would be on the economy of the nation; whether a depression period would set in following cessation of hostilities, and if so, when; what the nature and extent of such depression would be, together with other related general economic conditions, including increasing statutory control or supervision of industry. Specifically, in addition to the foregoing economic variables or indeterminants, the defendant was concerned with its own particular problems. First of all was its obligation to continue as a going concern. That it owed not only to its shareholders and bondholders, but primarily to the people of the State of Illinois. It had acquired a charter from that State to operate a railroad. The grant of the charter necessarily imposed obligations upon the railroad company to the people of the State of Illinois. Those obligations obviously included the continued operation of the road for the convenience of the public, and likewise entailed the necessity for safe operation. To continue as a going concern two important considerations confronted the board of directors. One was the physical up-keep; the other was its financial ability to meet its obligations.

Its physical properties were in bad shape. Likewise its financial structure, and its weaknesses and pressing necessity for improvement, were described by the president,

298

the chairman of the board, and other directors. They acted in their best judgment, indeed seeking financial advice from other experts in the field of finance in order to make their own conclusions doubly certain. The wisdom of the withholding of dividends was indicated not only in the correspondence with the Reconstruction Finance Corporation, but in the general report of the Interstate Commerce Commission, heretofore referred to. Finally, there is not the slightest suggestion of illicit motive in connection with the deliberations and determinations of the board of directors.

The plaintiff argues that the excuses which determined the defendant in omitting the declaration of preferred dividends are legally untenable; that its loans from the Reconstruction Finance Corporation, the vexatious charter tax issue, the necessity for providing for improvement for the Cairo bridge, the amount of deferred maintenance and the reduction of its funded debt, afforded no adequate or legal excuse for failure to declare dividends. The board, of course, took the other view. There is no Illinois law nor federal law, as has been shown in the cases referred to hereinbefore, which makes these determinations of the directors illegal. As I have indicated, the authorities are with the defendant.

If the plaintiff were to be granted judgment here it would in effect be a holding that, the noncumulative shares involved were cumulative preferred stock. I cannot find anything in the stock certificate, the resolution of the stockholders nor that of the board of directors which would make that result possible. Clearly such an intent is not disclosed, but on the contrary the redemption clause in the certificate enables the company to call upon the noncumulative preferred stockholders to surrender upon not less than sixty days notice at a premium of 15% of the par value, in addition to dividends declared or unpaid. (The privilege accorded the holders of noncumulative preferred stock is to convert such stock at the holder's option into common stock.) In this case it would mean that if even today the stock were redeemed, the most that the plaintiff would get for his stock is 115, since there are no dividends declared and unpaid. Instead his claim in this action is in effect that he be permitted to hold his stock and be paid dividends aggregating 66% of the par value of the stock.

Despite the waiver by the defendant of the defense of estoppel, it may well be stressed that in respect to equities, if any, it is significant that throughout the years from 1937 to 1947, inclusive, though net profits in excess of dividends as well as surplus were shown in the published annual reports of the company, no action was instituted by any holder of either the preferred stock or the common.

So far as the plaintiff himself is concerned, his first purchase of stock, fifty shares, was made on November 15, 1944 at 39⅛, and subsequent purchases of fifty shares each on November 21, 1944 at 38¾, on December 4, 1944 at 41⅜, and on January 25, 1945 at 48¼, though it was a matter of record at all such times that the board of directors, beginning with the year 1932, had not declared or paid any dividend on said preferred stock.

For all of the foregoing reasons the complaint will be dismissed. Appropriate findings of fact and conclusions of law will be presently filed.